DEBRA TITUS,            )
                                  )
            Plaintiff ,       )
         v.              )         CIVIL ACTION
                                    )         NO. 09-12193-NMG
TOWN OF NANTUCKET,     )
KEITH MANSFIELD and     )
JOHN MUHR,            )
                                  )
           Defendants.    )

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 29, 2011

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff Debra Titus ("Titus") was arrested by Nantucket Police Officers Keith Mansfield ("Mansfield") and John Muhr ("Muhr")  for allegedly violating a restraining order that had been issued pursuant to Mass. Gen. Laws ch. 209A.  She contends that the arrest was without probable cause, and, therefore, in violation of her statutory and constitutional rights, and that the police used excessive force and otherwise treated her unlawfully.  Titus has brought a complaint alleging that the Town of Nantucket ("Town" or "Nantucket") and the individual officers violated the Massachu-setts Tort Claims Act, Mass. Gen. Laws ch. 258 (Count I), and her federal civil rights in violation of 42 U.S.C. § 1983 (Counts III, IV and V).  She also asserts that the defendants

are liable for false imprisonment (Count X), and negligent/intentional denial of medical

care (Count XI). In addition, Titus contends that the Town is liable for common-law

negligence (Count II), and that the two police officers are liable for violations of the

Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I (Counts VI and

VII), and for assault and battery (Counts VIII and IX).

This matter is presently before the court on the Defendants' Motion for Summary

Judgment (Docket No. 18), pursuant to which the defendants are seeking summary

judgment in their favor on all counts of the complaint. For the reasons detailed herein,

this court recommends to the District Judge to whom this case is assigned that the

defendants' motion be ALLOWED IN PART and DENIED IN PART. Specifically, this

court recommends that the motion for summary judgment be denied as to the claims

against the individual officers in Counts IV and V (42 U.S.C. § 1983) and VIII and IX

(assault and battery), but otherwise allowed.

## II. <u>STATEMENT OF FACTS</u>[1]

At all relevant times, Dolores Bennett ("Bennett") resided in Nantucket,

Massachusetts in the main house on the property. Her daughter-in-law, the plaintiff

---

[1] Unless otherwise indicated, the facts are derived from Defendants' Concise Statement of the Material Facts (Docket No. 20) ("DF"), Plaintiff's Response to Defendants' Concise Statement (Docket No. 24) ("PR") and the supporting affidavits and exhibits. In a separate order of this date, the court has denied the plaintiff's motion to strike various paragraphs of the affidavit of defendant Muhr and several exhibits. As detailed in this court's order on the motion to strike, that information is not being offered for the truth of the matter asserted but, rather, simply to establish what information the police officers had before them when they decided to arrest the plaintiff.

Debra Titus,[2] resided in another house on the same property. Titus and her husband, Bennett's son, were estranged. Bennett had obtained a restraining order against Titus on May 25, 2006, which was renewed several times and remained in effect as of November 13, 2006. See Def. Ex. B (Docket No. 18-2). Pursuant to the restraining order, issued pursuant to Mass. Gen. Laws ch. 209A, Titus was to stay away from Bennett's residence, and not to come closer than 5 yards from Bennett herself.

At approximately 7:00 p.m. on the evening of November 13, 2006, Nantucket Police Officer John Muhr responded to a call to the Bennett house for an unknown disturbance. See Muhr Incident Report (Docket No. 18-1). Nantucket Police Officer Keith Mansfield arrived a short time later. Id. At that time, Bennett told Muhr that she had a restraining order issued by the Nantucket District Court against Titus, and that Titus had violated the order. Muhr Aff. (Docket No. 18-1) at ¶ 3. According to Bennett, Titus had come to the front door and left a bag of items there, which was in violation of the restraining order. Muhr Aff. ¶ 7. The bag was filled with Bennett's son's personal papers, including a passport, pictures and other personal property. See Bennett Statement of 11/13/06 (Docket No. 18-2). The papers were all torn into small pieces and destroyed. Muhr Incident Report at 1.

---

[2] At the time of the incident in question, the plaintiff went by her married name of Debra Bennett. To avoid confusion, the plaintiff will be referred to by the name under which she filed suit, Debra Titus.

**Defendants' Evidence**

According to the defendants, the police officers confirmed that the Mass. Gen. Laws ch. 209A restraining order was in effect against Titus.  <u>Muhr Aff.</u> (Docket No. 18-1) at ¶ 4.  They also obtained a signed statement from Bennett confirming that she had seen Titus leave the items on her front door step.  <u>Muhr Incident Report</u> at 2.  The officers then went to Titus' house where they met up with Titus.  <u>Muhr Aff.</u> ¶ 8.  According to the police officers, after acknowledging that she knew there was an active restraining order against her, the plaintiff was advised that she was being placed under arrest.  <u>Muhr Aff.</u> ¶¶ 9-10.  Titus refused to place her hands behind her back, but rather crossed her arms in front of her and began to resist arrest.  <u>Muhr Aff.</u> ¶ 11.  Plaintiff also started to run away, but was caught by the police and placed on the floor, where she continued to physically resist arrest by placing her hands and arms under her body.  <u>Muhr Aff.</u> ¶¶ 11-13.  The police were eventually able to remove her hands from beneath her body and handcuff her.  <u>Muhr Aff.</u> ¶ 14.  She was transported to the Nantucket Police Station by another policeman, Officer Joseph Mastrick, who had been called to the scene, and placed in a cell.  <u>Muhr Aff.</u> ¶ 16; <u>Muhr Incident Report</u> at 2.

According to the police, Titus refused to answer any booking questions and was swearing.  <u>Muhr Aff.</u> ¶ 16.  She was again told why she was under arrest, and given her station rights, including the right to use the phone, but she continued to refuse to cooperate.  <u>Muhr Incident Report</u> at 2; <u>Mashrick Supplementary Report</u> (Docket No. 18-1) at 1; <u>Coakley Supplementary Report</u> (Docket No. 18-1) at 1.

Titus was arraigned the next morning and then released. <u>Muhr Aff.</u> ¶ 17. At some point prior to her court appearance, she called an attorney from the police station. <u>Titus Depo.</u> (Docket No. 18-3) at 55. The charges against her of violating the restraining order and resisting arrest were later dismissed.[3]

### Plaintiff's Evidence

While Titus agrees with the basic scenario as presented by the defendants, her version of events differs in several respects. According to Titus, when she responded to a knock at the door on the evening of November 13, 2006, there were two police officers who asked if she knew about "a bag" and asked if she knew what a restraining order meant. <u>Titus Aff.</u> (Docket No. 24-1) at ¶¶ 4-5; <u>Titus Depo.</u> at 49. While Titus denies that she knew why she was being arrested, she does recall the police asking her whether she was aware of the restraining order, and admits that she did confirm to the officers that she was aware of the restraining order. <u>Titus Depo.</u> at 49. According to Titus, she was then told to get dressed, which she did. <u>Titus Aff.</u> ¶ 6. Titus has submitted an affidavit describing the events surrounding her arrest as follows:

> 7.     After I got dressed the officers told me I was under arrest. When I asked why and what was going on I was physically thrown to the ground face first. I was not told to place my hands behind my back, and I did not run away.

_____

[3] Titus contends that the dismissal was voluntary while the defendants cite "the failure of the prosecutor to provide discovery." <u>See</u> DF ¶ 17.

8.      After I was thrown to the floor the officers grabbed my hands and arms which were under me and handcuffed me behind my back. At no time did I resist arrest.

9.      Upon arriving at the police station, I was brought to a cell, was not allowed to use a phone and was not allowed access to my medication, despite asking for the same. I did not refuse to answer questions.

10.     It was not until the next morning after I had been arrested and after I had been held overnight that I was able to call an attorney.

11.     The following morning I was brought to court, released, wherein I went to the emergency room, with injuries to my shoulders and arms and bruising to my knees and face.

12.     The criminal charges brought against me were voluntarily dismissed by the District Attorney's office.

13.     At no time did I walk to Dolores's front door and leave a bag on her front step.

Titus Aff. Titus has not submitted any medical records or other evidence to support her contention that she went to the emergency room or was injured. The police contend that any use of force was reasonable. Muhr Aff. ¶ 15.

At her deposition, Titus testified that she was told she was under arrest, but was not told why, and then the police officers "just put me on the ground and handcuffed me." Titus Depo. at 44-45. When asked to "[d]escribe exactly" what she meant by putting her on the ground, she testified "[p]hysically put me face down on the floor." Titus Depo. at 45. She then described the arrest and handcuffing as follows:

I was on the floor with my hands maybe in front of me a little bit and they pulled them around and they were rough, very rough, and there was tremendous pressure on my back, and they handcuffed my hands

very tight, but I've never had handcuffs, so to me it was very tight, and, again – and they had my face pushed to the side. My glasses – I don't – I never got my glasses 'til the next day. I mean, they were some place in the house.

Titus Depo. at 46. She described her stay at the station as follows:

> They walked me to a cell, a terrible cell, it was a cold steel bed or whatever, shiny steel with a filthy toilet and it was freezing. And they made me take my shoes off, which I had only slipped on to leave the – I mean, when they said, "Go get changed," or whatever I put jeans on and some Merrell – no socks. They took the shoes, and I still only had that T-shirt on, the man's T-shirt with nothing else and it was freezing. At some point a gentleman came in that was extremely rude and –

Titus Depo. at 50.

Titus testified that after she was released the next morning, she went to her attorney's office, and he insisted that she go to the emergency room. Titus Depo. at 56. When asked why she went to the emergency room, she testified as follows:

A.    I had from the arrest substantial bruising, my knees were skun up.

Q.    Your knees were what?

A.    Skunned, skun up.

Q.    Skinned up; is that what you're saying?

A.    Yeah, scratched up. I was mauled up. I mean, I just –

Q.    Describe for me with detail what you're claiming.

A.    My shoulder, I was in pain. In fact, I was in such pain in the cell that I couldn't even lay on the metal bed. My elbow, my – all in here, my forearms and my wrists, my back, my face, over here.

Q.    What was on your face?

A.    Well, there ended up being a big black and blue, a contusion.  I mean, no blood.

Q.    You're pointing, just so the record reflects what you're doing –

A.    The cheek below my eye.

Q.    You're pointing to the left side of your face?

A.    I believe, yes.

Q.    Well, you're pointing to it.

A.    I believe that was the side, yes.

Titus Depo. at 56-57.

Finally, Titus did testify that she asked for some medicine, but it was refused.  See DF ¶ 14.  Specifically, she contends that the police failed to provide her with her diabetes or hypertension medication while she was in custody.  Verified Compl. (Docket No. 1-3) at ¶ 40.  However, she does not allege that she suffered any specific harm from her alleged failure to take these medications.

Additional facts will be provided below where appropriate.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute is one which "may reasonably be resolved in favor of either party."  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir.

2008) (quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)).  A material fact is one which could "sway the outcome of the litigation under the applicable law."  <u>Id.</u> (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  <u>See</u> <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can only avoid summary judgment by providing properly supported evidence of disputed material facts sufficient to require trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing a genuine issue for trial.  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993), <u>cert. denied</u>, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994) (internal quotations omitted).  The court must view the record in the light most favorable to the non-moving party and must indulge all reason-able inferences in that party's favor.  <u>Vineberg</u>, 548 F.3d at 56.  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  <u>Walsh v. Town of Lakeville</u>, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

### B.    Count I: Claims Under the Massachusetts Tort Claims Act

In Count I of her Verified Complaint ("Compl."), Titus has brought a claim against the police officers and the Town under the Massachusetts Tort Claims Act ("MTCA"),

Mass. Gen. Laws ch. 258, alleging that the defendants are liable for the assault and battery allegedly committed on the plaintiff by the police officers acting in the course of their employment.  Compl. (Docket No. 1-3) at ¶¶ 6-7.  In responding to the defendants' motion for summary judgment, the plaintiff concedes that there is no liability against the individual officers under the MTCA and that, therefore, Count I should be dismissed as to them.  Pl. Mem. (Docket No. 23) at 3; see also Mass. Gen. Laws ch. 258, § 2 (no public employee "shall be liable for any injury or loss of property of personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment").  For the reasons detailed herein, this Count should be dismissed with respect to the Town as well.

The MTCA abrogates the doctrine of sovereign immunity and allows a suit against a public entity, but only to the extent provided in the statute.  Chaabouni v. City of Boston, 133 F. Supp. 2d 93, 95 (D. Mass. 2001).  Thus, pursuant to Mass. Gen. Laws ch. 258, § 2, the Town, as a public employer, "shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances[.]"  However, the public employer remains immune from, among other things, "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, [and] intentional mental distress[.]"  Mass. Gen. Laws ch. 258, § 10(c).  In the instant case, the plaintiff has not alleged any independent negligent conduct on the part of

the Town, such as a negligent failure to supervise; rather she is seeking to hold the Town directly liable for the assault and battery allegedly committed by the individual police officers. As ch. 258, § 10(c) recognizes, however, assault and battery is, by definition, an intentional tort for which the Town cannot be held liable. <u>See</u> <u>Chaabouni</u>, 133 F. Supp. 2d at 96-98, and cases cited (while City cannot be held liable for the alleged assault and battery committed by police officers, it may be liable under the MTCA for its own alleged negligence in failing to train and supervise the officers). Moreover, all the facts as alleged by the plaintiff establish that she is challenging intentional acts allegedly done by the police officers. Since the Town cannot be liable for any such acts, including any alleged assault and battery committed by the police officers, summary judgment as to all the defendants should be entered on Count I of the Complaint.

### C.    <u>Count II: Negligence</u>

In Count II of the Complaint, the plaintiff alleges that the Town of Nantucket was negligent in the hiring, training, retraining and supervision of the police officers. <u>Compl.</u> ¶¶ 11-13. This count should be dismissed as well. While a claim of negligent supervision and training may state a claim under the MTCA, <u>see</u> discussion <u>supra</u>, in the instant case the plaintiff has not put forth any facts in support of her claim. Therefore, the defendants' motion for summary judgment as to Count II should be allowed.[4]

_____

[4] In her opposition to the motion for summary judgment, Titus argues that a jury could find that the police officers were acting outside of the scope of their employment and, therefore, can be held liable for negligence based on their acts against the plaintiff. <u>Pl. Opp.</u> (Docket No. 23) at 4. Regardless whether this argument states a claim, it does not relate to the claim as

### D.    Count III: Municipal Liability Under 42 U.S.C. § 1983

In Count III of her Complaint, Titus is seeking to hold the Town liable for the Officers' allegedly wrongful conduct on the grounds that the Town "allow[ed] a pattern of conduct consisting of harassment, intimidation, and excessive force prior and at the time of the incidence currently alleged thereby personally depriving the Plaintiff of her constitutional rights." Compl. ¶ 16. Because the plaintiff has failed to put forth any facts to support her claim, summary judgment in favor of the Town should enter on Count III of the Complaint.

42 U.S.C. § 1983 itself does not grant substantive rights, "but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quotations and citations omitted). There are two essential elements within a section 1983 claim. "First, the challenged conduct must be attributable to a person acting under color of state law [and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997) cert. denied, 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 2d 32 (1997). While "municipalities and other local governmental bodies are 'persons' within the meaning of § 1983[,]" they cannot be held liable under § 1983 solely on the grounds that they employ a tortfeasor. Bd. of County

---

pleaded. In Count II of her Verified Complaint, plaintiff is seeking damages arising out of the Town's alleged "negligent hiring, training, retraining and supervision of its Officer[.]" Compl. ¶ 13.

Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 1387-88, 137 L. Ed. 2d 626 (1997). Similarly, municipalities cannot be held liable under a theory of *respondeat superior*. Id. at 403, 117 S. Ct. 1388. Instead, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Id. "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 404, 117 S. Ct. at 1388 (emphasis in original). See also Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005 (acknowledging that the Supreme Court "has set a very high bar for assessing municipal liability[.]").

In the instant case, Titus has not presented any facts to establish the existence of a municipal policy or custom. As described in her memorandum opposing the motion for summary judgment, "[i]n support of the Plaintiff's claim, the Plaintiff points to the behavior of the defendants and their persistence that said behavior was appropriate given the circumstances." Pl. Opp. (Docket No. 23) at 4. This conclusory assertion that the defendants thought that they acted appropriately, even if true, is not sufficient to establish a municipal custom or policy. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 131 S.

Ct. 1350, 1359 (2011).  Titus has offered no facts from which a fact-finder could deter-

mine whether a municipal policy or custom existed in the instant case, much less the

parameters of any such policy or custom.  See Haley v. City of Boston, No. 10-2064,

2011 WL 4347027, at *9 (1st Cir. Sept. 19, 2011) ("plaintiff must identify a municipal

'policy' or custom' that caused the plaintiff's injury")(quotation omitted).  For these

reasons, this court recommends that the Town's motion for summary judgment as to

Count III of the complaint be allowed.

### E. Counts IV & V: Individual Liability Under 42 U.S.C. § 1983

In Counts IV and V of her Complaint, Titus alleges that Officer Mansfield and

Officer Muhr "deprived the Plaintiff, personally of her federal constitutional rights" and

that as a result "the Plaintiff has been seriously injured both physically and mentally and

incurred medical expenses as a result."  Compl. ¶¶ 19-20, 22-23.  In her opposition to the

motion for summary judgment, Titus argues that she was assaulted by the officers, that

she did not resist arrest and was injured, and that, in addition, "she was held without

access to a phone, without being told why she was under arrest and was deprived of her

medication during said period."  Pl. Opp. at 4-5.  The police officers deny that they

violated any of Titus' constitutional rights and argue that, even if they did, they are

entitled to qualified immunity.  For the reasons detailed herein, this court finds that taking

the facts as alleged by the plaintiff as true, which I must, Titus has presented sufficient

evidence to support a claim of unconstitutional use of excessive force, and to show that

the police officers are not entitled to qualified immunity.  Therefore, this court

recommends to the District Judge to whom this case is assigned the defendants' motion for summary judgment as to Counts IV and V be denied.[5]

As noted above, to state a claim under 42 U.S.C. § 1983, the plaintiff must establish that the alleged wrongdoer was acting under color of state law, and that there was a violation of the plaintiff's constitutional rights.  Soto, 103 F.3d at 1061.  In the instant case, there is no dispute that each of the individual defendants was acting in his official capacity at all relevant times and was therefore acting under color of state law for purposes of the plaintiffs' federal civil rights claims.  Thus, the inquiry is whether the alleged assaultive behavior could be found to have violated Titus' constitutional rights.

### Excessive Force

Although she has not identified the specific constitutional violation on which she is basing her claims, this court assumes that Titus is asserting that the police used excessive force in connection with her arrest.  "A claim that the police used excessive force in making an arrest must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures."  Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990), cert. denied, 500 U.S. 956, 111 S. Ct. 2266, 114 L. Ed. 2d 718 (1991).  Accord Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) ("*all* claims that law enforcement officers have

---

[5]  In light of this conclusion, this court has not addressed whether other alleged conduct about which Titus complains also violated her constitutional rights.  She has not cited any cases or constitutional provisions which would apply to such alleged conduct.

used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"). Because "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," a determination as to "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72 (internal quotations and citations omitted). Thus, "[t]he pertinent question is whether the force used was 'objectively reasonable' under all the circumstances; that is, whether it was consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee into custody." Gaudreault, 923 F.2d at 205. In applying this test, courts must "pay careful attention to the facts and circumstances of the particular case at hand, including the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight." Id. However, it is important to remain mindful that "not every push or shove rises to the level of a constitutional violation." Id. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on

the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

Where, as here, "the parties offer diametrically opposite versions of the facts, each founded on first-hand knowledge, we must ask whether the account propounded by the nonmovant suffices to thwart the swing of the summary judgment ax." Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009). Here the plaintiff alleges that, without provocation, she was thrown to the ground, violently handcuffed, and suffered bruises on her face, knees and shoulders requiring some medical attention. Accepting the evidence most favorable to the plaintiff (without expressing any opinion as to whether these facts would be established at trial), the facts show that while the plaintiff was charged with violating a restraining order, the severity of the crime was minimal. Specifically, the charge was that she dropped torn papers off at her mother-in-law's home — there was no charge that she was engaged in physically violent behavior which violated the restraining order. According to the plaintiff, she did not pose any threat to the safety of the officers or others, she did not resist arrest, and she did not attempt to flee. Under this version of events, anything more than very minimal force, if any, might be found to be inappropriate. See generally Mlodzinski v. Lewis, 648 F.3d 24, 37 (1st Cir. 2011) (where young girl who was not a suspect was allegedly shoved to the floor and thereby suffered severe damage to her kneecap, was handcuffed behind her back with metal handcuffs, and detained with an assault rifle to her head for 7 to 10 minutes, jury could find Fourth Amendment violation). Therefore, while the question is not free of doubt, this court finds

that there is sufficient evidence for the plaintiff's claims to survive the motion for summary judgment.

## Qualified Immunity

The next inquiry is whether the police officers are entitled to qualified immunity. "Under the doctrine of qualified immunity, police officers are protected from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mlodzinski, 648 F.3d at 32 (quoting Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009)) (additional citation and internal quotations omitted). The First Circuit recently explained the appropriate analysis as follows:

> Following Pearson we employ a two-prong analysis in determining whether a defendant is entitled to qualified immunity. We ask (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. The second prong, in turn, has two parts. We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right. The salient question is whether the state of the law at the time would have given a reasonably competent officer clear notice that what he was doing was unconstitutional.

Mlodzinski, 648 F.3d at 32-33 (internal citations and quotations omitted). "While a claim of qualified immunity requires deference to the objectively reasonable beliefs and actions of the defendants, even if they are mistaken, the summary judgment standard requires that we draw all reasonable inferences in plaintiffs' favor as long as they are based on facts

that are put forward on personal knowledge or otherwise documented by materials of evidentiary quality." Id. at 28 (internal quotations omitted). Therefore, the court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id. at 29 (internal quotation and punctuation omitted).

In the instant case, as detailed above, this court has concluded that, based on Titus' version of events, a jury could find that the force used to arrest Titus was excessive and in violation of her Fourth Amendment rights. There is no question that the right to be free from the use of excessive force was clearly established as of the time of the plaintiff's arrest. See Morelli, 552 F.3d at 23-24 (in light of "well-settled jurisprudence," defendant "was on notice that a police officer's use of excessive force would be offensive to the Constitution."). "The question, then, reduces to whether [the defendants'] use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." Id. at 24. This inquiry is "complicated" since, "[b]y definition, excessive force is unreasonable. But reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force." Id. Consequently, in order to defeat a defense of qualified immunity, the plaintiff must establish "an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim and, further, beyond the 'hazy border'" between excessive and reasonable force noted by the Supreme Court[.]" Morelli, 552 F.3d at 24 (citing Saucier v. Katz, 533 U.S. 194, 206, 121 S. Ct.

2151, 150 L. Ed. 2d 272 (2001) for the principle "that qualified immunity operates in excessive force cases to 'protect officers from the sometimes hazy border between excessive and acceptable force'")) (additional internal citations omitted).

Accepting the plaintiff's version of events as true, as the court must at this juncture, a jury may conclude that there was no reason to use any force to subdue a cooperative suspect, and that the level of force used could not be justified in any way. See Morelli, 552 F.3d at 24 (no qualified immunity where facts did "not justify yanking the arm of an unarmed and non-violent person, suspected only of the theft of $20, and pinning her against a wall for three to four minutes with sufficient force to tear her rotator cuff."). Since "under the plaintiff's version of the facts a reasonable officer should have known that the degree of force used was plainly excessive[,]" qualified immunity is not appropriate at this time. Id. Consequently, this court recommends that the defendants' motion for summary judgment as to Counts IV and V be denied.

### E. Counts VI and VII: Claims Under the Massachusetts Civil Rights Act

In Counts VI and VII, Titus contends that Officer Mansfield and Officer Muhr violated the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H and 11I since "while acting under the color of law, [they] interfered by threats, intimidation, or coercion or attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment by the Plaintiff, personally, of her rights secured by the Commonwealth of Massachusetts[.]" Compl. ¶¶ 25, 28. For the reasons detailed herein,

this court recommends that summary judgment be entered in favor of the defendants on these Counts.

The MCRA provides, in relevant part:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.

Mass. Gen. Laws. ch. 12, § 11H. Furthermore, the MCRA authorizes civil actions by any person subjected to an interference of rights as described in § 11H. Id. § 11I. To prevail, the plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Bally v. Northeastern Univ., 403 Mass. 713, 717, 532 N.E.2d 49, 51-52 (1989) (quoting Mass. Gen. Laws ch. 12, § 11H). "The MCRA is coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation or coercion." Sietins v. Joseph, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (quotations and citations omitted). This additional requirement distinguishes valid claims under the MCRA from those under Section 1983.

For purposes of the MCRA, "a 'threat' involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. 'Coercion' involves the application to another of such force, either physical or moral, as to constrain a person to do against his will something he would not otherwise have done." Farrah v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (internal punctuation and citation omitted). "A direct violation of civil rights is not, without a showing of coercive behavior, actionable." Orwat v. Maloney, 360 F. Supp. 2d 146, 164 (D. Mass. 2005) (quotation omitted). Here, Titus has put forth sufficient facts to support a claim that the individual defendants violated her Fourth Amendment rights. "What is absent, however, is any showing (or even pleading) that the violation was intended to coerce [Titus] into refraining from the exercise of a right or privilege secured by law. There is no right under state or federal law to resist an arrest or search, even one that is illegal from its inception." Farrah, 725 F. Supp. 2d at 248. Accord Orwat, 360 F. Supp. 2d at 164-65 (while inmate may have established a violation of his Eighth Amendment right to be free from the use of excessive force, that is a direct violation of his constitutional right and does not constitute a violation of the MCRA). Since Titus has, at most, established a direct violation of her constitutional rights, summary judgment should enter in the defendants' favor on Counts VI and VII of the Complaint.

## F.    Counts VIII and IX: Assault and Battery

In Counts VIII and IX, Titus alleges claims of assault and battery against Officer Mansfield and Officer Muhr.  Specifically, she states in her complaint that the officers, by "unjustifiably touching and using force" upon her, committed assault and battery. Compl. ¶¶ 31, 34.  For the reasons detailed herein, this court recommends that the defendants' motion for summary judgment be denied as to these counts.

"[A]ssault and battery is the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another."  Commonwealth v. McCan, 277 Mass. 199, 203, 178 N.E. 633, 634 (1931).  A police officer "attempting a valid arrest has the right to use the force which is reasonably necessary to overcome physical resistance by the person sought to be arrested . . . ."  Julian v. Randazzo, 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980).  "The standard for determining whether force is reasonable for assault and battery claims is 'essentially the same' as the standard for determining if force is reasonable for Fourth Amendment excessive force claims."  Parker v. Town of Swansea, 270 F. Supp. 2d 92, 102 (D. Mass. 2003).  Therefore, "when a plaintiff alleges both a Fourth Amendment excessive force claim and an assault and battery claim in the same complaint, the constitutional claim and the common law claim 'rise or fall in the same manner.'"  Id. (quoting Jesionowski v. Beck, 937 F. Supp. 95, 105 (D. Mass. 1996)).

As set forth above, Officers Mansfield and Muhr are not entitled to summary judgment on the plaintiff's excessive force claims because a disputed issue remains as to

whether these defendants used an objectively reasonable amount of force or employed force that was excessive under the circumstances. As a result, the defendants' motion for summary judgment on the assault and battery claim should be denied as well.

### G. Count X: False Imprisonment

Pursuant to Count X of the Complaint, the plaintiff is seeking to hold all the defendants liable for false imprisonment on the grounds that she was falsely and wrongfully arrested, detained and imprisoned without probable cause. Compl. ¶ 37. For the reasons detailed herein, this court recommends that the defendants' motion for summary judgment as to this Count be allowed, as the defendants had probable cause to arrest Titus and to detain her until she could see a magistrate in the morning.

To prove a false imprisonment claim, the plaintiff must establish "(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." Sietins, 238 F. Supp. 2d at 381 (quotations and citations omitted). Where the claim arises out of an arrest or detention by a police officer, the restraint "will constitute false imprisonment unless the police officer had a legal justification." Rose v. Town of Concord, 971 F. Supp. 47, 51 (D. Mass. 1997). The establishment of probable cause for an ararest "is not to be confused with the more onerous standard of proof of guilt beyond a reasonable doubt. Rather, probable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed

and that the suspect is implicated in its commission." <u>Morelli</u>, 552 F. 3d at 21 (internal citation omitted).

Here, the police officers had information that Titus had violated a restraining order issued pursuant to Mass. Gen. Laws ch. 209A. Pursuant to Mass. Gen. Laws ch. 209A, § 6(7), a police officer shall "arrest any person a law officer witnesses or has probable cause to believe has violated a temporary or permanent vacate, restraining, or no-contact order or judgment[.]" The Officers confirmed that the restraining order was in effect, and obtained a statement from Bennett asserting that she had seen Titus violating the restraining order by coming onto Bennett's front porch. This is sufficient to establish probable cause for the arrest. <u>See</u> <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 80 (1st Cir. 2005) (explaining that probable cause "exists if the facts and circumstances within the [arresting officer's] knowledge and of which [he] had reasonably reliable information would suffice to warrant a prudent person in believing that a person has committed or is about to commit a crime." (quotations and citation omitted)). Since a "police officer's initial finding of probable cause justifies not only arrest, but a reasonable period of continued detention for the purpose of bringing the arrestee before a magistrate[,]" Titus has not established a claim for false imprisonment, and summary judgment should enter in favor of the defendants on Count X of the Complaint. <u>Thompson v. Olson</u>, 798 F.2d 552, 556 (1st Cir. 1986), <u>cert. denied</u>, 480 U.S. 908, 107 S. Ct. 1354, 94 L. Ed. 2d 524 (1987).

## H. Count XI: Denial of Medical Care

In Count XI of her Complaint, Titus alleges that the defendants, either intentionally or negligently, failed to provide her with her diabetes or hypertension medication while she was in custody, or to provide her with medical care for her injuries. <u>Compl.</u> ¶¶ 40-41. Titus has not put forth any facts to establish that she suffered any harm as a result of the overnight delay in her receiving this unspecified medicine or treatment. Therefore, this court recommends that the defendants' motion for summary judgment as to Count XI be allowed.

When a suspect is taken into custody, the police "assume[] a duty of reasonable care." <u>Ringuette v. City of Fall River</u>, 146 F.3d 1, 5 (1st Cir. 1998). However, "[w]here a prisoner claims that [her] Eighth Amendment right to be free from cruel and unusual punishment was violated because [she] did not receive proper medical care, [she] must prove that the defendant's actions amounted to 'deliberate indifference to serious medical needs." <u>Tolbert v. Clarke</u>, No. 10-11643-RWZ, 2011 WL 2530975, at *4 (D. Mass. June 21, 2011) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 105, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976)). "[I]nadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference. To plead deliberate indifference, a plaintiff must allege facts from which the Court may reasonably infer that the defendant had a culpable state of mind and intended wantonly to inflict pain." Id. (quoting <u>Braga v. Hodgson</u>, 605 F.3d 58, 61 (1st Cir. 2010), and <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir. 1991) (internal punctuation omitted)). Titus has not put forth any facts to support such a finding.

Moreover, assuming, without deciding, that the police officers and the Town could be liable for negligence, Titus' claim must nevertheless fail. "Actual damages or loss are an essential element of the tort of negligence." Bernal v. Weitz, 54 Mass. App. Ct. 394, 396, 765 N.E.2d 798, 800 (2002). Here, Titus has not alleged any facts which establish that the alleged delay in allowing her to take her medicine or to treat her for unspecified injuries caused her any harm. This alone is fatal to her claim. Therefore, this court recommends that Counts XI be dismissed.

## IV.  CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the defendants' motion be ALLOWED IN PART and DENIED IN PART. Specifically, for all the reasons set forth above, this court recommends that the motion for summary judgment be denied against the individual officers with respect to Counts IV, V, VIII and IX, but that the motion otherwise be allowed.[6]

---

[6] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 687 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir.

/ s / Judith Gail Dein
                                        Judith Gail Dein
                                        U.S. Magistrate Judge

---

1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).